UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **THOMAS DANIEL RHODES,** | **CIVIL NO. 04-176 (RHK/SRN)** |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| **JOAN FABIAN,**<br>**Minnesota Commissioner of Corrections,** | |
| Respondent. | |

Deborah Ellis, Esq., on behalf of Petitioner Thomas Rhodes.

Thomas R. Ragatz, Esq., on behalf of Respondent Joan Fabian.

SUSAN RICHARD NELSON, United States Magistrate Judge

This case involves the petition of Thomas Rhodes, a state prisoner in the custody of Respondent Joan Fabian (hereinafter "the Commissioner"), for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Rhodes was convicted of murder in Minnesota state court. In his habeas petition, Rhodes contends that the evidence offered against him was so deficient as to make his conviction offensive to his right to due process guaranteed under the Fifth and Fourteenth Amendments to the U.S. Constitution. In the alternative, Rhodes contends for various reasons that he received ineffective assistance of counsel in violation of the Sixth Amendment of the U.S. Constitution under the standard established in Strickland v. Washington, 466 U.S. 668 (1984), and its progeny, and that he is entitled to a new trial based on newly discovered evidence. The matter is before the undersigned Magistrate Judge for a Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons set forth below, it is recommended that Rhodes' petition be denied and that this case be dismissed.

## I. BACKGROUND

**A. Procedural History**

The state criminal proceedings against Rhodes have an extensive procedural history, and the issues Rhodes raises in his habeas petition are discussed in several state court opinions. After a twelve-day trial in July 1998, a jury found Rhodes guilty of premeditated first-degree murder in violation of Minn. Stat. § 609.185(1) (1998) and of intentional second-degree murder in violation of Minn. Stat. § 609.19 subd. 1(1) (1998). Rhodes received a mandatory sentence of life imprisonment under Minnesota law. Id. § 609.185 (1998). Shortly thereafter, Rhodes filed a motion for a new trial based on newly discovered evidence, which the trial court denied. See State v. Rhodes, 627 N.W.2d 74, 81 (Minn. 2001) (hereinafter "Rhodes I") (discussing post-trial proceedings in the trial court). Minnesota permits a direct appeal to the Minnesota Supreme Court in first-degree murder cases, Minn. Stat. § 632.14, and Rhodes filed an appeal of his conviction along with a motion to stay the appeal pending disposition of his state court petition for post-conviction relief. Rhodes I, 627 N.W.2d at 81. The Minnesota Supreme Court granted the stay. Id.

In his petition for post-conviction relief, Rhodes contended, inter alia, that the evidence at trial was insufficient to support the verdict and that he had received ineffective assistance of counsel. Id. at 77. The trial court denied Rhodes' petition without holding an evidentiary hearing. Id. at 83. The Minnesota Supreme Court later determined that an evidentiary hearing was necessary to resolve certain issues related to Rhodes' ineffective assistance of counsel claim and accordingly stayed the appeal and remanded the case for further development of the record on those issues. Id. at 89. Following an evidentiary hearing held over the course of four days (Trs. of Sept. 10-11, 2001, Dec. 13, 2001, and Jan. 23, 2002 [Docket Nos. 11-14]), the trial court made extensive findings of fact and again denied Rhodes' petition. State v. Rhodes, No. K6-97-1529 (Kandiyohi Cty. Dist. Ct. Apr. 19, 2002) (App. 2 to Pet'r's Memo. [Docket No.

3])(hereinafter "Post-Conviction Order"), aff'd, 657 N.W.2d 823 (Minn. 2003) (hereinafter "Rhodes II"). The Minnesota Supreme Court ultimately held that the evidence at trial was sufficient to sustain Rhodes' conviction, Rhodes II, 657 N.W.2d at 839, that Rhodes had received effective assistance of counsel, id. at 842, and that Rhodes was not entitled to a new trial based on newly discovered evidence. Id. at 845.

Rhodes filed his petition for a writ of habeas corpus (Docket No. 1) in this Court on January 26, 2004. The petition raises four issues for federal habeas review: (1) whether Rhodes' continued detention violates his federally protected right to due process on the ground that the State failed to prove all elements of its case against Rhodes beyond a reasonable doubt; (2) whether Rhodes' trial counsel's failure to object to certain questions the prosecutor asked of the State's medical expert constituted ineffective assistance of counsel; (3) whether Rhodes' trial counsel's decision not to investigate certain matters prior to trial constituted ineffective assistance of counsel; and (4) whether the denial of Rhodes' request for a new trial based on newly discovered evidence violated Rhodes' federally protected right to due process. The Commissioner filed a return on March 30, 2004 (Docket No. 9), arguing in essence that this Court should deny Rhodes' petition for the reasons stated by the Minnesota Supreme Court.[1]

**B. Evidence at trial**

A federal habeas court, when reviewing the sufficiency of the evidence to support a conviction, examines the evidence developed at trial in the light most favorable to the verdict. Sera v. Norris, 400 F.3d

---

[1] Rhodes also filed a document entitled "Supplemental Authority in Response to Respondent's Memorandum" (Docket No. 32) on November 8, 2004. On November 16, 2004, the Commissioner filed a motion to strike (Docket No. 34), arguing that the "Supplemental Authority" document is a traverse not permitted under the rules governing federal habeas proceedings or this Court's orders. The Court agrees with the Commissioner that the applicable rules do not permit the filing of the "Supplemental Authority" document and that the "Supplemental Authority" does little more than rehearse arguments already made in Rhodes' original memorandum. The Court accordingly will grant the Commissioner's motion to strike.

538, 540 (8th Cir. 2005) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The following discussion outlines the evidence received at trial and pertinent to the claims in Rhodes' habeas petition under that standard. More detailed summaries of the evidence appear in Rhodes I, 627 N.W.2d at 77-81, and Rhodes II, 657 N.W.2d at 828-32.

Rhodes' wife, Jane Rhodes, drowned in Green Lake near Spicer, Minnesota, on the night of August 2, 1996, when she was on vacation there with Rhodes and their two sons. The prosecution contended "that Rhodes planned his wife's death because he could not afford [a] divorce ... and because he would obtain substantial insurance benefits if she died." Rhodes II, 657 N.W.2d at 830. Katherine Mason testified that she had a relationship with Rhodes from January to July 1995, during which time Rhodes and Mason met about once a week at a bar or restaurant. (Trial Tr.[2] at 679, 681.) Although Mason testified that the relationship was not "romantic" (id. at 679), Mason admitted that her relationship with Rhodes involved hugging, kissing, and physical contact (id. at 682) and that on one occasion Rhodes had arranged to meet Mason privately in a hotel room, where they kissed and drank champagne together. (Id. at 680.) In May 1995, Rhodes arranged a meeting for himself and his wife with a lawyer, C. Andrew Johnson, concerning the possibility of a divorce. (Id. at 666-67.) Johnson discussed the couples' finances at that meeting and indicated that Rhodes' child support obligation following a divorce likely would have been $742 of Rhodes' monthly net income of $2,476. (Id. at 673.) Rhodes did not contact Johnson again to discuss a divorce. (Id. at 677.) During the period between April and July 1996, however, Rhodes and his wife acquired over $100,000 of additional life insurance coverage, including credit life insurance that would pay the balance of Rhodes' home mortgage and car and boat loans if his wife died, and had applied

---

[2] The trial transcript, which is divided into eleven volumes, is continuously paginated and is in the record. (Docket Nos. 16-26.)

4

for another $50,000 of coverage that was not issued because the application was received after Jane Rhodes' death. (Id. at 1005-09.) The amount of insurance proceeds payable to Rhodes in the event of Jane Rhodes' accidental death on August 2, 1996, was approximately $233,135. (Id. at 1015.)

Rhodes told law enforcement investigators that he and his wife went out on a jet boat for a ride on Green Lake between 11 and 11:30 pm on August 2, 1996. (Id. at 917.) Jane Rhodes was not wearing a lifejacket and was not a good swimmer (id. at 702), and she died after falling from the boat when Rhodes was driving.[3] The prosecution sought to prove "that Rhodes accelerated intentionally to cause Jane to fall out of the boat or pushed her out of the boat, zigzagged the area to create wake and possibly hit her, and then misdirected the authorities so that they would not discover her body." Rhodes II, 657 N.W.2d at 829. A group of four witnesses on the shore of Green Lake testified that they saw a jet boat similar to Rhodes' driving erratically around 11 pm on the night of Jane Rhodes' death. (Trial Tr. at 736, 752, 762, 768.) One of those witnesses, Andrea Iverson, testified that she heard "moaning sounds" coming from the boat and heard a woman's voice saying "no," "stop," and "it hurts" in a manner that was "kind of scary, out of control." (Id. at 752.) Iverson's husband, John Iverson, who was a competitive water skier, testified that he observed the boat "running what we call nine and eight patterns ..., just linear movements,

---

[3] Although Rhodes did not testify at trial, the law enforcement officers who investigated Jane Rhodes' death on August 2 and 3, 1996, testified concerning what Rhodes told them that night, and Rhodes also gave taped statements recounting what happened on the boat ride to law enforcement officers on August 15, 1996 [Docket No. 28], and to an insurance claim representative on October 10, 1996. The Minnesota Supreme Court noted that the prosecution sought to highlight inconsistencies in the various accounts that Rhodes gave of these events over time: "that [Rhodes] was driving slowly when [Jane] fell out and that he was driving almost at top speed, that there were no other boats on the lake at the time Jane fell in and that there was another boat but it did not respond to Rhodes' flashing lights, that Jane fell over the back of the boat and fell over the side, that he heard a muffled scream and that Jane did not scream, and that Rhodes immediately went back to where he thought Jane had fallen in and that he missed the throttle on the first grab but then turned the boat and headed back." Rhodes II, 657 N.W.2d at 841-42.

turn a corner, whip a corner, ... back and forth" for about twenty minutes. (Id. at 736.) A separate pair of witnesses, Dale and Karen DeRung, who were staying in a cabin on Green Lake near the Iverson residence, testified that they observed a similar boat on Green Lake at about the same time and in the same location. Both testified that they heard a woman scream (id. at 800, 827), that they observed the boat driving in circles (id. at 804), and that they eventually saw the boat drive "slowly" back in the direction of a public beach. (Id. at 807, 828.)

Mark Schroeder, who was a bouncer at a bar on the shore of Green Lake, observed Rhodes pull his jet boat to a dock near the bar about 12:50 am on August 3, 1996. (Id. at 840.) Schroeder testified that Rhodes did not appear to be distraught and that Rhodes walked at a normal pace past the bar and across the street to the hotel where Rhodes was staying. (Id. at 843.) Kandiyohi County law enforcement officers responded to an emergency call from that hotel at about 1 am on August 3, 1996. (Id. at 690.) Rhodes told the officers that his wife had lost her balance and fallen out of the boat while he was accelerating. (Id. at 872.) The officers took Rhodes with them to help them search for his wife (id. at 693), and Rhodes directed them to search an area directly east of the lights of downtown Spicer. (Id. at 695, 868.) Deputy Michael Roe, who had specialized training in water safety and search and rescue (id. at 862), testified that he thought the officers would have found a body in the search area that night because the water was calm and the moon provided ample light. (Id. at 871.) The officers did not recover Jane Rhodes' body until the afternoon of August 3, 1996, when two fishermen told them they had spotted the body in the water. (Id. at 855-56.) The officers recovered the body at a location nearly a mile away from the area where Rhodes had told them to search. (Id. at 880.) The prosecution's expert in body recovery, William Chandler, testified that, given the water and weather conditions, Jane Rhodes' body could not have floated to the surface and moved to the location where it was discovered had she fallen from the boat in

6

the area Rhodes indicated. (Id. at 1122-23.)

The Kandiyohi County medical examiner, Dr. Lyle Munneke, examined Jane Rhodes' body on August 3, 1996, after officers brought the body to the morgue. (Id. at 593.) Dr. Munneke testified that "the thing that was most striking to me was the bruises about the forehead and the face[.]" (Id. at 594.) "There was redness and swelling over both eyes. The nose was quite bruised. And down along the right side of the mouth, the face, there was a lot of swelling[.] There was a cut ... from the lower lip into the mouth ... and the lower lip [was] very swollen." (Id. at 595.) Dr. Munneke could not determine whether the death was due to trauma or drowning and sent the body to a forensic pathologist in St. Paul for further investigation. (Id. at 597.)

Dr. Michael McGee, the chief medical examiner for Ramsey and Washington counties in Minnesota (id. at 603, 605), performed an autopsy on Jane Rhodes' body on August 6, 1996. (Id. at 610.) Dr. McGee examined the bruises on Jane Rhodes' face in detail and found significant hemorrhaging beneath the bruises. (Id. at 624.) Dr. McGee testified that a single blow could not have caused those injuries "because the injuries appear to be on both sides of the ... facial region" and that those injuries were consistent with "multiple strikes from the hull of a boat." (Id. at 626.) The cut on Jane Rhodes' mouth also was consistent, in Dr. McGee's opinion, with something striking the area of her face. (Id. at 627.) Dr. McGee believed, based on the level of hemorrhage he observed, that the injuries to Jane Rhodes' face occurred when she was still alive. (Id. at 627-28.) Dr. McGee also found "paired injuries to the upper extremities [i.e., one on each arm] that may represent defens[ive] wounds." (Id. at 634.)

Dr. McGee's examination, furthermore, revealed "a series of soft tissue hemorrhages inside her neck region." (Id. at 638.) Because no external marks were on the skin of the neck, Dr. McGee opined that Jane Rhodes "received some type of trauma to the outer surface of the skin in the neck area ... with

7

enough force ... to cause the blood vessels to rupture and cause the hemorrhage to occur for a period of time prior to [her] death." (Id. at 640.) With respect to that injury, the prosecutor asked, "Could that have been done by the hull of a boat?" (Id. at 641.) Dr. McGee responded, "I think not." (Id.) The prosecutor then asked, without objection from Rhodes' counsel, "Could that have been done with a hand, in particular a hand used thus in the V position?"[4], and Dr. McGee responded, "I believe that is possible, yes." (Id.) Dr. McGee testified, finally, that the injuries he observed to Jane Rhodes could have been fatal even if she had not drowned. (Id. at 644.)

**C. Post-conviction proceedings**

The state trial court made several findings of fact pertinent to the issues raised in Rhodes' habeas petition when ruling upon Rhodes' petition for post-conviction relief. The state court's factual findings, which are summarized below, are presumptively correct for purposes of federal habeas review, and the petitioner may rebut that presumption only with clear and convincing evidence. Evans v. Luebbers, 371 F.3d 438, 441 (8th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)), cert. denied, 125 S. Ct. 902 (2005).

Michael Colich was Rhodes' lead trial defense counsel, and Claudia Engeland assisted Colich at trial. (Post-Conviction Order at 2.) Colich was an experienced criminal lawyer, having been "the lead prosecutor in several murder cases" for the Hennepin County Attorney's Office and later, after limiting his practice to criminal defense, "involved in over 75 murder cases as defense counsel." (Id. at 3.) Engeland

---

[4] Despite both parties' extensive analysis of this question to Dr. McGee, precisely what the prosecutor meant by "the V position" is not clear from the written record or from any of the state court opinions. As Joel Friedberg, one of Rhodes' expert witnesses in the post-conviction proceedings, testified, "[Y]ou can tell from reading the transcript that [the prosecutor] made a 'V' with his hands, like this. But I couldn't tell from reading the transcript whether he motioned like this, or went like that, or what." (Post-Conviction Hr'g Tr. of Dec. 13, 2001 [Docket No. 13] at 13.) Friedberg understood the question to imply that "Rhodes reached out and essentially hit his wife in the throat" (id.), and that characterization is sufficient for purposes of discussing the claims in Rhodes' habeas petition.

8

"had been involved in the defense of seven murder cases, three as second-chair to Mr. Colich, and four as either lead or sole defense counsel." (Id.)

Engeland was primarily responsible for the examinations of the prosecution's medical experts, including Dr. McGee, at Rhodes' trial. (Id.) "Prior to trial, both [Engeland and Colich] had met with defense expert Dr. [Lindsey] Thomas to review the autopsy report of Dr. McGee and to analyze his opinions as well as alternative opinions expressed by Dr. Thomas. Recognizing that Dr. McGee was a 'formidable witness,' defense counsel developed a general trial strategy that they would not object to Dr. McGee's opinions if they were based on a reasonable degree of medical certainty. Furthermore, they would not object to Dr. McGee's opinions that were consistent with the defense theory that some of Jane Rhodes' injuries were the result of her being accidentally hit by the boat when [Rhodes] was attempting to find her. The defense trial strategy was to get Dr. McGee on and off the stand [as quickly as possible] and to offer alternative theories from the[ir] own expert[.]"[5] (Id. at 7) (quotation marks in original; citation to hearing transcript omitted). With respect to the prosecutor's questioning of Dr. McGee concerning the cause of hemorrhage in Jane Rhodes' neck tissues, the state trial court noted particularly that "Engeland did not object to Dr. McGee's testimony that the injury ... could have been caused by a blow by a hand in the 'V' position because she felt that the question [properly] could have been asked as a hypothetical. She thought that an objection followed by the same question in hypothetical form would emphasize the [prosecutor's] point to the jury." (Id. at 13.)

---

[5] Dr. Thomas in fact testified, contrary to Dr. McGee's opinions, that the injuries to Jane Rhodes' face were consistent with a single blow from a boat and that Jane Rhodes' neck and other injuries likely were sustained when she fell from the boat at high speed into the water. (Trial Tr. at 1206-07.) In his closing argument, Colich vigorously attacked Dr. McGee's credibility based on Dr. Thomas' testimony and the prosecution's failure to call any witness to rebut that testimony. (Id. at 1402-07.)

9

The newly discovered evidence underlying Rhodes' motion for a new trial was the testimony of Brian Hunter, who was a guest at the hotel where Rhodes was staying on August 2, 1996. Rhodes I, 627 N.W.2d at 81. Hunter testified at the post-conviction hearing that, sometime between 11 pm and midnight on August 2, 1996, he observed Rhodes drive his boat in circles on the lake, turn to drive swiftly toward shore, and then run "at top speed" past the bar on the shore and into the hotel. See Rhodes II, 657 N.W.2d at 835 (quoting Hunter's testimony at length). Hunter testified that he also saw Rhodes in the lobby of the hotel, "shaking, very frantic, [and] soaking wet, trying to tell a story of some type" to the night clerk. Id. at 836. Hunter did not come forward with his testimony until August 1998, when he again was staying at the same hotel and learned from the proprietor that Rhodes recently had been convicted of murder. (Post-Conviction Hr'g Tr. of Sept. 10, 2001 [Docket No. 11] at 14-15.) Colich and Engeland each met with the proprietor, Joseph Shemon, during their investigation of Rhodes' case, and "Shemon told Colich he did not know of any guest at the motel at the time that had any information" about Jane Rhodes' death. (Post-Conviction Order at 4.) Shemon, however, did not "give either Colich or Engeland copies of the guest register ... on the relevant dates" (id.), which presumably contained Hunter's name.

Rhodes also offered a substantial amount of new forensic medical testimony at his post-conviction hearing. Much of this evidence, as the state trial court noted, was consistent with Dr. Thomas' trial testimony. (Id. at 17-18.) Rhodes' medical experts, however, including Dr. Thomas, who changed the opinion she offered at trial, relied in part on newly published scientific articles in support of new opinions that Jane Rhodes' neck injuries occurred post-mortem. See Rhodes II, 657 N.W.2d at 846 & n.10 (discussing the post-conviction medical evidence). The prosecution in response offered additional testimony from Dr. McGee, who provided detailed explanations in support of his opinions in light of the new evidence and indicated that the new information would not have changed the opinions he offered at

10

trial. (Post-Conviction Order at 19-20.) No witness at the post-conviction hearing, furthermore, "testified as to how Dr. Thomas' trial testimony was inadequate to counter Dr. McGee's [trial] testimony." (Id. at 19.)

## II. DISCUSSION

A federal court may grant a writ of habeas corpus to "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Because the Minnesota state courts adjudicated all of the issues Rhodes raises in his habeas petition[6], Rhodes is not entitled to relief "unless the state court disposition 'resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.'" Nooner v. Norris, 402 F.3d 801, 806 (8th Cir. 2005) (quoting 28 U.S.C. § 2254(d)).

### A. Sufficiency of the evidence

Rhodes argues that the Minnesota Supreme Court's affirming his conviction is contrary to Jackson v. Virginia, 443 U.S. 307 (1979), which "squarely held that a person's right to due process is violated

---

[6] Rhodes argues that the state courts did not rule upon his argument that the prosecution failed to prove "corpus delicti" at trial, but the Minnesota Supreme Court clearly adjudicated all aspects of Rhodes' sufficiency of the evidence claim. The term "corpus delicti" in Minnesota law refers to "proof that a crime was committed." State v. Weber, 137 N.W.2d 527, 530 (Minn. 1965). In the context of a murder case, the Minnesota Supreme Court has stated that the prosecution has the burden of establishing corpus delicti through proving "the death of a human being and that a criminal agency produced it." State v. Voges, 266 N.W. 265, 266 (Minn. 1936). That concept does not meaningfully differ from and is encompassed within the modern statutory definition of first-degree murder under Minnesota law: "a person must have caused the death of another human being with premeditation and with intent to effect death." Rhodes II, 657 N.W.2d at 839 (citing Minn. Stat. § 609.185(a)(1) (2002)). The Minnesota Supreme Court specifically considered each element of that definition in its analysis. Rhodes II, 657 N.W.2d at 839-42.

when he or she is deprived of liberty but no reasonable jury could have convicted that person on the basis of the evidence presented at trial." Thomas v. Norris, 186 F.3d 1085, 1086 (8th Cir. 1999) (citation omitted). Although the evidence against Rhodes was entirely circumstantial, as the Minnesota Supreme Court acknowledged, Rhodes II, 657 N.W.2d at 840, it is well-settled that the prosecution may prove the elements of the offense by circumstantial evidence as well as by direct evidence. Hill v. Norris, 96 F.3d 1085, 1088 (8th Cir. 1996). And it "is not necessary that the evidence exclude every reasonable hypothesis except guilt; instead, the evidence is simply sufficient if it will convince a trier of fact beyond a reasonable doubt that the defendant is guilty." Id.

The Court finds that the evidence here, considered as a whole and in the light most favorable to the verdict, is sufficient to allow the jury to find each element of the offense beyond a reasonable doubt. Jane Rhodes fell from a boat that Rhodes was driving, and the medical testimony supported an inference that she sustained potentially fatal injuries from being struck by the boat hull at least twice before she died. The jury also reasonably could have inferred from the testimony of independent witnesses who observed the incident that Rhodes drove erratically for several minutes in an attempt to injure his wife and made no effort to rescue her before slowly returning to his hotel. That evidence, coupled with evidence of Rhodes' nonchalant demeanor after returning to shore, Rhodes' apparent attempts to mislead investigators regarding the location of the incident and the course of events, and Rhodes' financial and other motives, provides additional support for finding that Rhodes acted with premeditation and an intent to kill. The Court accordingly holds that Rhodes' conviction does not violate his federal right to due process as defined in Jackson.

**B. Ineffective assistance of counsel**

Rhodes contends that he received ineffective assistance of counsel under the federal constitutional

standard because his trial counsel failed to object to the "hand in the V position" question to Dr. McGee and because his trial counsel failed to conduct an investigation adequate to obtain the testimony of Brian Hunter prior to trial. "In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that the performance of his counsel was deficient and that he was prejudiced by the deficient performance. To establish that his counsel's performance was deficient, the defendant must show that counsel's representation fell below an objective standard of reasonableness. To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Odem v. Hopkins, 382 F.3d 846, 849-50 (8th Cir. 2004) (citing Strickland v. Washington, 466 U.S. 668 (1984)) (internal quotation marks omitted). A reviewing court need not reach the question of the reasonableness of counsel's conduct if it would be impossible for the defendant to demonstrate prejudice based on counsel's alleged errors. Strickland, 466 U.S. at 697 ("[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed").

The Minnesota Supreme Court concluded that Rhodes failed to establish prejudice under Strickland resulting from counsel's failure to object to the questioning of Dr. McGee, Rhodes II, 657 N.W.2d at 844, and this Court finds that conclusion to be a reasonable application of Strickland to these facts. Rhodes' argument on this issue is predicated on two assumptions: that Dr. McGee's testimony concerning the cause of Jane Rhodes' neck injuries was inadmissible under any circumstances and that such testimony was necessary to secure Rhodes' conviction. Neither of those assumptions is correct. Both the state trial court (Post-Conviction Order at 9) and the Minnesota Supreme Court, Rhodes II, 657 N.W.2d at 844, suggest that, as a matter of state evidentiary law, the prosecutor's question to Dr. McGee may have been objectionable but that the prosecutor could have elicited the same testimony if Rhodes' counsel had

13

made an objection. Rhodes cites no authority establishing definitively that the prosecutor could not have laid an adequate factual foundation for the question or propounded a proper hypothetical question on this subject to Dr. McGee. And, even if the state trial court would have sustained an objection, Dr. McGee's testimony in response to the "V" question was not necessary to the prosecution's case. Regardless of whether Rhodes struck his wife with his hands in a "V position," which Dr. McGee testified was possible, the jury permissibly could have inferred from other evidence in the case that Jane Rhodes sustained fatal injuries when Rhodes intentionally struck her with the hull of his boat.

The Minnesota Supreme Court likewise concluded that Rhodes failed to establish prejudice under Strickland resulting from counsel's failure to obtain the testimony of Brian Hunter prior to trial, Rhodes II, 657 N.W.2d at 844, and that conclusion is a reasonable application of Strickland to these facts as well. Although Hunter's testimony could have been helpful to Rhodes' case, particularly as a contrast to Schroeder's testimony concerning Rhodes' demeanor after returning to shore, Hunter's testimony is limited to that aspect of the case and is inconsistent with the testimony of several other witnesses who observed Rhodes' boat from the shore and with Rhodes' own account of the events. (See Post-Conviction Order at 6, 23-25) (discussing these inconsistencies in detail). Given those limitations, Rhodes cannot show that Hunter's testimony would have been reasonably likely change the outcome of the case, which a showing of prejudice under Strickland requires.

### C. Newly discovered evidence

Rhodes argues, finally, that the denial of a new trial based on the new evidence he offered at the post-conviction hearing, including the testimony of Hunter and the new medical evidence, violates his federally protected right to due process because that new evidence establishes his actual innocence of the crime. Although the Eighth Circuit has held that a showing of actual innocence will allow a habeas claim

14

to proceed despite a procedural default, Cox v. Burger, 398 F.3d 1025, 1031 (8th Cir. 2005) (citing Herrera v. Collins, 506 U.S. 390 (1993)), a claim of actual innocence in itself does not provide a ground "for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Burton v. Dormire, 295 F.3d 839, 848 (8th Cir. 2002) (quoting Herrera. 506 U.S. at 400). Rhodes has not established an actual constitutional violation in the state criminal proceedings for the reasons discussed above. Rhodes' claim of actual innocence, which is dubious at best based on the post-conviction evidence, thus is not cognizable.

### III. CONCLUSION

Therefore, based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

1. The Commissioner's motion to strike (Docket No. 34) be GRANTED, and

2. Petitioner Thomas Rhodes' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Docket No. 1) be DENIED.

Dated: April 22, 2005

    s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation on or before **May 9, 2005**. The party shall file with the Clerk of Court, and serve on all parties, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

15